COX FRICKE
A LIMITED LIABILITY LAW PARTNERSHIP LLP

JOACHIM P. COX                 7520-0
    jcox@cfhawaii.com
RANDALL C. WHATTOFF            9487-0
    rwhattoff@cfhawaii.com
KAMALA S. HAAKE                9515-0
    khaake@cfhawaii.com
800 Bethel Street, Suite 600
Honolulu, Hawaiʻi  96813
Telephone:  (808) 585-9440
Facsimile:   (808) 275-3276

Attorneys for Defendants
OHANA MILITARY COMMUNITIES, LLC and
HUNT MH PROPERTY MANAGEMENT, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| MICHAEL CASEY, PAYTON LAMB, and JAMIE WILLIAMS, on behalf of themselves and all similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>OHANA MILITARY COMMUNITIES, LLC; HUNT MH PROPERTY MANAGEMENT, LLC; ISLAND PALM COMMUNITIES, LLC; HICKAM COMMUNITIES, LLC; and DOE Defendants 1-10,<br><br>Defendants. | CIVIL NO.<br><br>DEFENDANTS OHANA MILITARY COMMUNITIES, LLC AND HUNT MH PROPERTY MANAGEMENT, LLC'S NOTICE OF REMOVAL; DECLARATION OF RANDALL WHATTOFF; DECLARATION OF JOSEPH RASH; DECARATION OF SHARYN PROCACCIO; EXHIBITS 1–3; CERTIFICATE OF SERVICE |

1

## DEFENDANTS OHANA MILITARY COMMUNITIES, LLC AND HUNT MH PROPERTY MANAGEMENT, LLC'S NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendants Ohana Military Communities, LLC ("Ohana") and Hunt MH Property Management, LLC ("Hunt") (collectively, "Ohana-Hunt Defendants") hereby petition the United States District Court for the District of Hawaiʻi for removal of the above-captioned state court action, Civil No. 1CCV-21-0001618, from the Circuit Court of the First Circuit, State of Hawaiʻi, pursuant to 28 U.S.C. §§ 1332, 1441, 1442, 1446, and 1453.

## I.     STATUS OF PROCEEDINGS IN STATE COURT

1.     On December 31, 2021, Plaintiffs Michael Casey, Payton Lamb, and Jamie Williams (collectively, "Plaintiffs") commenced an action in State Court by filing the above-entitled Class Action Complaint ("Complaint") in the Circuit Court of the First Circuit, State of Hawaiʻi, Civil No. 1CCV-21-0001618 (the "Action").  The Complaint alleges the following counts:  (1) Breach of Contract; (2) Breach of Implied Warranty of Habitability; (3) Violation of Hawaiʻi Revised Statute Chapter 521 – Landlord Tenant Code; (4) Unfair and Deceptive Trade Practices/Unfair Methods of Competition; (5) Nuisance; and (6) Wrongful Eviction.

2.     With the Complaint, Plaintiffs also included a Summons and a Demand for Jury Trial.  A true and correct copy of the Complaint, Summons, and Demand for Jury Trial are attached hereto as Exhibit 3.  Exhibit 3 constitutes all of

the pleadings served upon the Ohana-Hunt Defendants in this action, and all of the

documents in the State Court docket.  Whattoff Decl. ¶ 2.

3.     Plaintiffs served the Complaint on Ohana and Hunt by serving

Capitol Corporate Services, Inc., the registered agent for service of process, in

Hawaiʻi on January 3, 2022.  Therefore, this Notice of Removal, filed on

January 24, 2022, is timely filed pursuant to 28 U.S.C. §§ 1446(b) and 1453(b).

**II.     VENUE**

4.     Venue lies in the United States District Court for the District of

Hawaiʻi pursuant to 28 U.S.C. §§ 1441(a) and 1446(a).  This action was originally

brought in the Circuit Court of the First Circuit, State of Hawaiʻi.

**III.    GROUNDS FOR REMOVAL**

**A.     <u>Summary of Grounds for Removal</u>**

5.     "[A] defendant seeking to remove a case to a federal court must

file in the federal forum a notice of removal containing 'a short and plain statement

of the grounds for removal.'  . . .  Congress, by borrowing the familiar 'short and

plain statement' standard from Rule 8(a), intended to 'simplify the 'pleading'

requirements for removal' and to clarify that courts should 'apply the same liberal

rules to removal allegations that are applied to other matters of pleading." *Dart*

*Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) (citations

omitted).

6.     The Ohana-Hunt Defendants seek removal on three independent bases:

7.     First, this case squarely meets the requirements for removal under the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. §§ 1332(d) and 1453, because the amount in controversy exceeds the sum or value of $5 million exclusive of interest and costs, a member of the class of plaintiffs is a citizen of a state different from a defendant, and the number of all proposed class members is more than 100.  Moreover, because less than one-third of the putative class members are citizens of the state where the action was filed, removal is non-discretionary.  As the Supreme Court has noted: "[N]o antiremoval presumption attends cases invoking CAFA, which Congress enacted to facilitate adjudication of certain class actions in federal court."  *Id.* at 90.

8.     Second, the Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  A party seeking removal under 28 U.S.C. § 1442 must show: (1) it is a "person" within the meaning of the statute; (2) plaintiff's claims are "for or relating to" an act under color of federal office; and (3) it raises a colorable federal defense.  All elements are satisfied here because Plaintiffs' claims are based on water controlled and supplied by the Navy.

9.      Third, federal enclave jurisdiction exists because, on information and belief, the area where the alleged contamination occurred is a critical federal area.  Under *Lake v. Ohana Military Communities, LLC*, 14 F.4th 993, 1001 (9th Cir. 2021), Hawaiʻi military reservations designated as "critical" remain the exclusive jurisdiction of the federal courts.

**B.    Removal Under the Class Action Fairness Act**

10.     Pursuant to 28 U.S.C. §§ 1332(d)(2), 1332(d)(2)(A) and 1332(d)(5)(B), original jurisdiction extends to class actions, such as the present one, in which (1) the matter in controversy exceeds the sum or value of $5 million, exclusive of interest and costs; (2) any member of the class of plaintiffs is a citizen of a state different from any defendant; and (3) the number of all proposed plaintiff class members in the aggregate is more than 100.

11.     Moreover, where less than one-third of the putative class members are citizens of the forum state, removal is mandatory.  *See* 15 Daniel R. Coquillette, et al., Moore's Federal Practice - Civil § 102.26 (Online ed.) ("[W]hen one-third or fewer of the class members are citizens of the original forum state, federal courts must exercise jurisdiction over the class action.  CAFA does not permit federal courts to decline to exercise jurisdiction in this situation.") (emphasis added, citation omitted).

12.     Here, as discussed at length below, removal is mandatory because the case clearly meets the jurisdictional pre-requisites and because less than one-third of the putative class members are citizens of Hawai'i.  Moreover, even if Plaintiffs could somehow show that more than one-third of the putative class members are citizens of Hawai'i, the interests of justice do not support remand given the unique status of the putative class of military service members and their families.

### 1.     The Amount in Controversy Exceeds $5 Million

13.     CAFA requires a $5 million jurisdictional minimum for class action removal.  28 U.S.C. § 1332(d)(2).  The claims of the individual class members are aggregated to determine whether the matter in controversy exceeds this amount.  28 U.S.C. § 1332(d)(6).  Interest and costs are excluded, *id.*, but Courts do include punitive damages and attorneys' fees, *Richmond v. Allstate Ins. Co.*, 897 F. Supp. 447, 449–50 (S.D. Cal. 1995).

14.     The Supreme Court has made clear that, with respect to the amount-in-controversy requirement, a defendant need merely have a good faith basis to allege that the amount exceeds $5 million.  "[W]hen a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court. . . . [It would be] anomalous to treat commencing plaintiffs and removing

defendants differently with regard to the amount in controversy." *Owens*, 574 U.S. at 87–88.

15.     "Defendants do not need to prove to a legal certainty that the amount in controversy requirement has been met.  Rather, <u>defendants may simply allege or assert that the jurisdictional threshold has been met</u>." *Id.* at 88–89 (emphasis added).

16.     Here, the amount placed in controversy by the Complaint exceeds the jurisdictional minimum of $5 million.  Plaintiffs allege in the Complaint that they "have sustained harm, expenses and other damages in an amount to be proven at trial, which include, but are not limited to: a. Overpayment for rent for services for Defendants' failure to provide the safe and healthy home and community represented by Defendants; [and] b. Loss of use and enjoyment in their homes and community[.]"  Compl ¶ 34.  Plaintiffs further allege that "[u]nder the terms of their lease, Plaintiffs are entitled as the prevailing party to reasonable attorneys' fees and costs required to pursue this action." *Id.* ¶ 35.

17.     Plaintiffs further seek "treble damages" under Chapter 480, and "[p]unitive damages for Defendants' wanton, reckless, and grossly negligent conduct." *Id.*, p.14 (prayer for damages).

18.     Plaintiffs seek a traditional award of attorneys' fees and costs, as well as attorneys' fees as an element of damages.  *See id.* ¶ 36 ("As a proximate

and legal result of Defendants' breaches of contract, Plaintiffs have been compelled to resort to litigation and therefore request an award of all consequential damages, including, but not limited to, attorneys' fees and costs incurred in such litigation, in amounts to be proven at time of trial.").

19.    The class consists of "<u>more than 2000</u>" residents, apparently spread across all of the Ohana-Hunt Defendants' neighborhoods in the Pearl Harbor area. *Id.* ¶ 24 (emphasis added); *see also id.* ¶ 3 ("Plaintiffs are tenants who have leased residential housing within the City and County of Honolulu from Defendants and have been forcibly evicted from their homes due to contaminated drinking water caused by fuel leaks associated with the Red Hill Bulk Fuel Storage Facility ('Red Hill') maintained by the United States Department of the Navy.").

20.    The Ohana-Hunt Defendants own and lease 4,273 housing units in the areas around Pearl Harbor. *See* Rash Decl., ¶ 14.  The average rent in these homes is $3,300.  *See id.*  If Plaintiffs are seeking the return of just one month rent as damages, that alone would exceed the jurisdictional limit under CAFA.

21.    Accordingly, the broad scope of damages asserted in the Complaint, as well as Plaintiffs' claim for attorneys' fees, multiplied by each potential member of the proposed class, exceeds the jurisdictional minimum of $5 million set forth in 28 U.S.C. § 1332(d)(2).

**2.      Minimal Diversity**

22.      The minimal diversity requirement of 28 U.S.C. § 1332(d)(2) merely requires that any member of the plaintiff class be a citizen of a different state than <u>any</u> defendant.

23.      Defendant Hunt is a citizen of Texas and Delaware.

a.      Hunt is a property management company that provides property management services to military housing communities throughout the United States.  These services include functions such as receiving rents, executing leases, assisting with leasing, and other actions typically associated with residential property management.  Procaccio Decl. ¶ 11.

b.      Hunt provides property management services for approximately 52,000 units spread across more than 40 military installations on behalf of the Navy, Air Force, and Marine Corps.  This includes communities in Alabama, Arkansas, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Louisiana, Massachusetts, Mississippi, New Mexico, Nevada, Oklahoma, South Carolina, South Dakota, Texas, Tennessee, Virginia, Washington State, and Washington D.C.  *Id.* ¶ 12.

c.      There is no single state where Hunt MH Property Management, LLC provides a majority of its property management services.  *Id.* ¶ 13.

      d.     The company headquarters for Hunt is in El Paso, Texas. This is the site where day-to-day control over the company is exercised, where strategy is set, and where company-wide decisions are made. The offices of the company's highest-ranking executives are located in El Paso, and as a result, this is the location where major policy, advertising, finance, and similar decisions originate. This is also the location where LLC records are maintained. The principal place of business and the management headquarters for the companies that have an ownership interest in Hunt are also located in El Paso. *Id.* ¶ 14.

      e.     Hunt is organized under the laws of Delaware.

      f.     All of Hunt's members, and all other entities in Hunt's membership/ownership chain, are also citizens of Texas and/or Delaware. *See id.* ¶¶ 15–16; *see also id.* ¶¶ 7–10. All such entities have their principal place of business in Texas, and are organized under the laws of Delaware. *See id.*

      24.     With respect to the citizenship of the class members, it is well settled that citizenship for purposes of diversity means domicile rather than residence. *See, e.g., Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973) (citing *Gilbert v. David*, 235 U.S. 561, 569 (1915)). "To acquire domicile within a particular state, a person must be physically present in the state and must have either the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere." *Id.* (citing *Gilbert*, 235 U.S. at 569–70).

Residency alone is not sufficient to demonstrate intent to remain; only domicile is determinative. *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

25. It is widely recognized that military service members do not establish a new domicile at the state in which they are stationed without significant additional steps:

> It makes eminent good sense to say as a matter of law that one who is in a place solely by virtue of superior force exerted by another should not be held to have abandoned his former domicile. . . . The most obvious example is the serviceman. It has long been the rule that presence at his military station, without more, cannot make the station his domicile because a serviceman is subject to the orders of his superior officer. A corollary of this rule is that <u>a serviceman who</u> lives on the military base, even if his family is living on-base with him, cannot establish a domicile at the base.

*Stifel*, 477 F.2d at 1121–22 (emphasis added) (citations omitted). The presumption is rebuttable only by a showing of "clear and unequivocal evidence" of intent to make a home in the place of military service. *See, e.g., Rosado-Marrero by Rosado-Cancel v. Hospital San Pablo*, 927 F. Supp. 576, 577 (D.P.R. 1996); *Volmer v. Volmer*, 371 P.2d 70, 72 (Or. 1962) ("<u>[T]he ordinary conduct of a person residing in this state incident to a military assignment here does not constitute sufficient evidence of the necessary domiciliary intent.</u>  To be relevant, conduct must be probative of intent, and not merely an incident of living in a given place.") (Emphasis added).

26.    Although the Complaint fails to assert the citizenship of the proposed class members, minimal diversity is demonstrated by the fact that the vast majority of the tenants are citizens of states other than Texas or Delaware (and Hawai‘i, for that matter).  *Id.* ¶ 10.  All 50 states are represented, with most residents providing forwarding addresses in California.  *See id.*  Therefore, the minimal diversity requirement is satisfied because there are members of the plaintiff class who are citizens of states other than Texas or Delaware.

**3.    The Proposed Class Consists of More Than 100 Members**

27.    28 U.S.C. § 1332(d)(5)(B) requires that the number of members of all proposed plaintiff classes in the aggregate be more than 100.  Here, Plaintiffs have alleged that the class consists of "more than 2000" residents.  Compl. ¶ 24.

28.    The Ohana-Hunt Defendants' neighborhoods in the Pearl Harbor area that comprise approximately 4,273 housing units.  Rash Decl. ¶ 10.

29.    The proposed number of plaintiffs in the case therefore exceeds 100.

**4.    Removal Is Mandatory Because Less Than One-Third of the Proposed Class Members Are Citizens of the State of Hawai‘i**

30.    Where the requirements of CAFA are met, and where less than one-third of the putative class members are citizens of the state where the action was filed, removal is mandatory.  Therefore, the Court has jurisdiction over the

present case, since less than one-third of the proposed class members are citizens of the State of Hawaiʻi.

31.    Significantly less than one-third of the class has taken the steps necessary to make Hawaiʻi their domicile.  This is not surprising as the vast majority of servicemembers stationed in Hawaiʻi leave the state after their tour concludes.  Indeed, even Plaintiffs' counsel has stated that they "rushed to get the lawsuit started, <u>so military residents can join the class action before they leave Hawaii</u>." *First class-action lawsuit filed on behalf of residents affected by Navy's tainted water crisis*, Haw. News Now (Dec. 31, 2021 6:06, p.m.), [https://www.hawaiinewsnow.com/2022/01/01/first-class-action-lawsuit-filed-behalf-residents-affected-by-navys-tainted-water-crisis/](https://www.hawaiinewsnow.com/2022/01/01/first-class-action-lawsuit-filed-behalf-residents-affected-by-navys-tainted-water-crisis/) (emphasis added).

32.    This lack of intent to make Hawaiʻi their domicile is demonstrated by a number of additional factors.

33.    First, according to the Personnel Support Activity Detachment for Pearl Harbor, only 2% of the sailors they service pay Hawaiʻi state income tax, and the rest pay taxes in other states.  While the Personnel Support Activity Detachment services some sailors outside of Hawaiʻi, the vast majority are currently stationed in Hawaiʻi.  This alone should be determinative.

34.    Second, Defendants' former tenants have not evidenced an intent to stay in Hawaiʻi upon conclusion of their orders.  During the last three

years, 1,925 residents have moved out of the Ohana-Hunt Defendants' Navy

communities.  When residents move out, Defendants request a forwarding address.

Of the individuals who have moved out during this time period, 858 provided

forwarding addresses, and only 169 of those addresses were in Hawai'i (19.7%).

In other words, 80.3% of residents immediately left Hawai'i when they moved off

base.  Rash Decl. ¶ 9.

       35.    Therefore, at most, only 19.7% of the residents who lived in the

Ohana-Hunt Defendants' Pearl Harbor communities intended to establish a

domicile in the State of Hawai'i.  In fact, the number is significantly less because

many of the individuals who move off base simply move into private rental

housing until the conclusion of their tour, and then return to their home state.

       36.    Third, the residents' phone numbers provide another data point.

There are 5,786 individuals who leased housing in the Ohana-Hunt Defendants'

Navy communities over the past three years.  Of those individuals, 814 residents

(14.1%) provided a home phone number with a Hawai'i area code, and 805

residents (13.9%) provided a mobile phone number with a Hawai'i area code.

Rash Decl. ¶ 8.  Given that it is much easier to obtain a new mobile phone number

than establish a domicile, the actual number of Hawai'i citizens are significantly

fewer than these percentages.

37.     The evidence shows that more than two-thirds of the residents stationed in Hawaiʻi do not consider Hawaiʻi their permanent home and cannot be considered citizens of the state.  Therefore, the Court has mandatory jurisdiction because the class action meets the minimal diversity requirement and less than one-third of the proposed class members are citizens of the State of Hawaiʻi.

> **5.     Even if Removal Was Not Mandatory, the "Interests of Justice" Do Not Require Remand in This Case**

38.     Even if the Court somehow finds that more than one-third of the putative class members are Hawaiʻi citizens, this is not a case where the "interests of justice" require remand.

39.     First, to the extent that the one-third threshold could ever be exceeded, the data on taxes, forwarding addresses, and phone numbers suggests it would be minimal.  In such an event, the Court should consider how often military members and their dependents are stationed in different states or countries for only a few years before moving to a new location.  Military members and their families are a highly mobile population, and the case law demonstrates that they cannot be presumed to adopt a new citizenship each time they receive orders to relocate.

40.     Second, the purpose of CAFA is to "expand[] federal jurisdiction over class actions and facilitate[] their removal."  *In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1072 (C.D. Cal. 2010) (emphasis added); *see also West Virginia ex rel. McGraw v. Comcast Corp.*, 705 F. Supp. 2d

441, 449 (E.D. Pa. 2010) ("With … significant changes in place, federal courts have jurisdiction over more class action suits than they did prior to CAFA's enactment, which was Congress's intent.").

41.    Third, the nature of this dispute is uniquely federal. The residences in questions are located on land owned by the federal government; defendant Ohana Military Communities, LLC is a public-private partnership between a private entity and the federal government; the housing at issue is a product of a unique federal statute known as the Military Housing Privatization Initiative; and the purported class members are federal service members or their family members.

42.    Fourth, the water at issue is supplied by the Navy from a utility it owns and operates. *See, e.g.*, Compl. ¶ 13.  To the extent that there is any liability, it is not with the Ohana-Hunt Defendants.

43.    Fifth, Plaintiffs allege that any fuel contamination was caused by the Navy, not the Ohana-Hunt Defendants.  *See id.* ¶¶ 16–17 ("The water supply for residential housing leased to Plaintiffs, however, has not been sufficiently protected from the risk of fuel contamination associated with repeated leaks of petroleum fuel from the United States Department of the Navy's Red Hill Bulk Fuel Storage Facility ('Red Hill').  Red Hill is an underground storage tank ('UST') system on the Island of Oahu in the State of Hawai'i, approximately 2.5

miles northeast of Pearl Harbor, and consists of twenty USTs as well as pipelines and other infrastructure associated with the storage and distribution of marine diesel and jet fuel.").

44.     Given the numerous federal issues in this case, the federal court is the appropriate forum for his case.

### C.     Removal Is Proper Under 28 U.S.C. § 1442(a)(1)

45.     The Federal Officer Removal Statute authorizes removal of a civil action against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . ."  28 U.S.C. § 1442(a)(1).

46.     A party seeking removal under 28 U.S.C. § 1442(a)(1) must demonstrate:  (1) it is a "person" within the meaning of the statute; (2) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claim; and (3) it raises a colorable federal defense.  *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1243 (9th Cir. 2017).

47.     All elements are satisfied here for the Ohana-Hunt Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiffs' allegations, directly relate to Plaintiffs' claims.

### 1.    Defendants Are "Persons" Under 28 U.S.C. § 1442(a)(1)

48.    Corporations, limited liability companies, and other entities constitute "persons" under 28 U.S.C. § 1442(a)(1).  *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals[.]"); *Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.4 (9th Cir. 2014); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). Therefore, Defendants are "persons" within the meaning of the statute.

### 2.    Defendants "Acted Under" a Federal Officer, and There Is a Causal Nexus Between Those Actions and Plaintiffs' Claims

49.    Because the Navy exercises control over the water used in the communities, and because Plaintiffs' claims relate directly to the condition of the water, this requirement is easily met.

50.    "The words 'acting under' are broad, and the Supreme Court has made clear that the statute must be liberally construed.  For a private entity to be 'acting under' a federal officer, the private entity must be involved in an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Goncalves*, 865 F.3d at 1245 (9th Cir. 2017) (quotations omitted); *see also Watson*

*v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007) ("The words 'acting under' are broad.").

51.    Here, the Ohana-Hunt Defendants "acted under" a federal officer in supplying water to the relevant communities because the government controlled all aspects of water extraction, treatment, and distribution.  Indeed, the only portion of the system that is owned by the Ohana-Hunt Defendants is the short section that connects a home to the trunk line near the curb.  Every part of the process before the street is controlled by the Navy.

52.    More specifically:

a.    The Navy owns the land where the Ohana-Hunt Defendants' Pearl Harbor communities are located, and Ohana Military Communities leases the land from the Navy.  Under the terms of the ground lease with the Navy, the Navy is responsible for providing water to the homes.  *See* Rash Decl. ¶¶ 15–19 & Ex. 1 ("[T]he Lessee shall have no responsibility for the water system or maintaining the water lines, except the Lessee shall own and maintain the water line from the [point of demarcation—*i.e.*, the corporation stop] to each Housing Unit or other Improvement, as applicable.").

b.    Ohana Military Communities purchases water from the Navy pursuant to a Utility Sales Agreement.  The Utility Sales Agreement specifies that "The Government shall deliver utility services up to the Delivery

Point of Demarcation (POD) (as defined below) that conform to quality standards mandated in applicable federal, state and local regulations and statutes." *See* Rash Decl. ¶ 20 & Ex. 2.

        c.     With respect to the water supplied under the Utility Sales Agreement, the Navy dictates both the origin of the water and all steps used to prepare the water before it is sent to the homes.  To the extent water is pumped from the Navy owned well shaft, filtered, disinfected, chlorinated, tested, or otherwise prepared before being transmitted through Navy owned infrastructure to the homes, this was dictated by the Navy.

        53.     Assuming the truth of Plaintiffs' allegations, the Ohana-Hunt Defendants' alleged actions taken under a federal officer's direction relate to Plaintiff's claims.  To meet this prong, a defendant's conduct need only "relat[e] to any act under color" of a federal office.  28 U.S.C. § 1442(a)(1).  As the Ninth Circuit explained, this is a "low bar." *Goncalves*, 865 F.3d at 1245; *see also id.* at 1244 (explaining that the "hurdle erected" by this requirement is "quite low").

        54.     As noted previously, Plaintiffs claim they were exposed to contaminated water as a result of the Navy's management of the Red Hill Bulk Fuel Storage Facility.  Not only does the Navy have sole control over the Red Hill Facility, it also has sole control over the water utility that supplies water to the Ohana-Hunt Defendants' homes in the Pearl Harbor area.

55.    Plaintiffs claim that, "[u]nder the terms of their leases, tenants agree to pay rent in exchange for the services provided by Defendant Landlords including the provision of potable water and safe and habitable housing in compliance with all state and local laws for health and safety."  Compl. ¶ 15. Under the terms of Ohana's Utility Sales Agreement with the Navy, the Navy is responsible for providing water "that conform[s] to quality standards mandated in applicable federal, state and local regulations and statutes."

### 3.    Defendants Raise a Colorable Defense

56.    The Ohana-Hunt Defendants intend to raise a number of meritorious federal defenses.  For instance, derivative sovereign immunity precludes liability for contractors performing work pursuant to a government contract.  *See Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 20 (1940) ("[I]f this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will."); *Myers v. United States*, 323 F.2d 580, 583 (9th Cir. 1963) ("To the extent that the work performed by McLaughlin, Inc., was done under its contract with the Bureau of Public Lands, and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the appellants.").  Here, the provision of all of the

water was pursuant to agreements with the Navy, including the ground lease and the Utility Sales Agreement.

57.    Other colorable defenses exist, including the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011), and preemption, *see Goncalves*, 865 F.3d at 1250.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

### 4.    Enclave Jurisdiction

58.    In *Lake v. Ohana Military Communities, LLC*, 14 F.4th 993, 1001 (9th Cir. 2021), the Ninth Circuit held that "[t]he Admission Act reserves the power of exclusive legislation under the Enclave Clause, but also permits Hawaiʻi to exercise concurrent jurisdiction, while reserving the United States' right to exercise exclusive jurisdiction over areas it designates as critical.  Because the United States has not designated MCBH as a critical area, Hawaiʻi's concurrent legislative jurisdiction continues to apply here."

59.    The Hunt-Ohana Defendants respectfully disagree with the Ninth Circuit's decision in *Lake*, and Ohana intends to apply for a writ of certiorari to the Supreme Court.

22

60.     On information and belief, the Red Hill Underground Fuel

Storage Facility Red Hill ("Red Hill") is located on land that has been owned by

the United States Navy since before the Admissions Act, and continues to be

owned and controlled by the Navy.

61.     On information and belief, Red Hill is an area of critical

importance.  *See, e.g.*, Commander, Navy Region Hawai'i, About Red Hill,

https://www.cnic.navy.mil/regions/cnrh/om/red-hill-tank/about-red-hill.html

("[T]he Red Hill Bulk Fuel Facility can operate without external power, is

physically protected and cyber-hardened and is critical infrastructure for the

nation's defense."); Anita Hofschneider, "The Stakes Are High": Why The Navy

Doesn't Want to Defuel the Red Hill Tanks, Civil Beat (Dec. 22, 2021),

https://www.civilbeat.org/2021/12/the-stakes-are-high-why-the-navy-doesnt-want-

to-defuel-the-red-hill-tanks/ (noting that Deputy Assistant Secretary of the Navy

testified that Red Hill was "critical national security asset"); Determination of the

Chief Management Officer (July 31, 2020) (finding requested information exempt

from disclosure under the Freedom of Information Act),

https://open.defense.gov/Portals/23/Documents/FOIA/FOIA_Resources/7-31-

2020_Determination.pdf ("The [Red Hill Bulk Fuel Storage Facility] serves as the

primary fuel storage facility for U.S. military ships and aircraft operating from

Hawai'i and throughout the Pacific Area of Operations, and it is of vital strategic

significance.  The RHBFSF holds a significant percentage of petroleum war

reserves required to defend national security interests in the Indo-Pacific region.

As USINDOPACOM's strategic reserve, it supports all U.S. military forces

throughout the theater, including those stationed in and transiting through Hawai'i.

It also supports the Hawai'i Army and Air National Guard, and is available to

support civil authorities, should circumstances dictate.  The hardened,

underground, cyber-protected, gravity-fed fuel system is unique, and there is no

comparable U.S. owned facility anywhere from India to the continental United

States.").

       62.     Because the claims in this case are all premised on purported

fuel leaks that occurred at a critical area, the federal courts have exclusive

jurisdiction.  *See, e.g.*, Compl. ¶¶ 16–19 ("The water supply for residential housing

leased to Plaintiffs, however, has not been sufficiently protected from the risk of

fuel contamination associated with repeated leaks of petroleum fuel from the

United States Department of the Navy's Red Hill Bulk Fuel Storage Facility ("Red

Hill").  . . .  Red Hill is estimated to have leaked more than 178,434 gallons of fuel

since its inception and presents an undisputed risk to the aquifer that furnishes

potable water to the communities leased by Defendant Landlords.

## IV.    NOTICE TO ADVERSE PARTIES AND STATE COURT

63.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice shall be promptly served on Plaintiffs' counsel of record and will be filed with the Clerk of the Circuit Court of the First Circuit, State of Hawaii.

## V.    CONSENT TO REMOVAL

64.    The other defendants, Island Palm Communities, LLC and Hickam Communities, LLC, consent to the removal.  Whattoff Decl., ¶ 3.

## VI.    CONCLUSION

65.    By removing this action to this Court, Ohana does not waive any defenses, objections, or motions available under state or federal law. Ohana expressly reserves the right to move for dismissal of Plaintiffs' claim pursuant to Rule 12 of the Federal Rules of Civil Procedure (and/or any other rule).

66.    WHEREFORE, Ohana prays that the above-entitled action be removed from the Circuit Court of the First Circuit, State of Hawaiʻi, to the United States District Court for the District of Hawaiʻi.

DATED: Honolulu, Hawaiʻi, January 24, 2022.

/s/Randall C. Whattoff
JOACHIM P. COX
RANDALL C. WHATTOFF
KAMALA S. HAAKE
Attorneys for Defendants
OHANA MILITARY
COMMUNITIES, LLC, MH
PROPERTY MANAGEMENT, LLC